GREAT HIVE OF THE LADIES OF THE MACCABEES FOR MICHIGAN *v.* SUPREME HIVE OF THE LADIES OF THE MACCABEES OF THE WORLD.

1. BENEFIT SOCIETIES—RIVAL ORGANIZATIONS—SECRET WORK— COMPETITION—ESTOPPEL.

Complainant, a secret beneficial society, was incorporated in 1891, with its jurisdiction limited to the State of Michigan; and defendant, a similar organization, with a similar name, was also incorporated in Michigan in 1892, its jurisdiction being intended to embrace all parts of the United States except the State of Michigan, and certain other States where like organizations were already established. Complainant devised and adopted a ritual and certain secret work, badges, and paraphernalia, which it subsequently, in view of advantages accruing to its members, permitted defendant to use, and the work and methods of the two organizations were practically the same. Both had life-insurance features, which were maintained on the assessment plan, but, by reason of defendant's policy of accumulating a reserve fund, the assessments levied and collected by it were much greater than those collected by complainant. Defendant, on the

faith of its right to use such ritual, etc., had extended its work over many States, at an expense of more than $200,000, when complainant, with a view to furthering the prosperity of its insurance business, determined to extend its operations beyond the State of Michigan, and into defendant's jurisdiction, and its articles of incorporation were amended accordingly. *Held*, that complainant was estopped from competing with defendant, in the territory occupied by it, by using the same, or substantially the same, ritual, etc., and that defendant was entitled to an injunction restraining such action. GRANT and HOOKER, JJ., dissenting.

#### ON SETTLEMENT OF DECREE.

2. SAME.

On settlement of the decree in such case, the court refused to investigate and determine whether complainant's proposed new ritual, secret work, etc., substantially differed from those used by defendant, so as to enable complainant to carry on competitive work in defendant's field.

3. SAME—INJUNCTION.

While defendant's right to the exclusive use of such ritual, etc., in territory outside of Michigan, was based upon a corresponding right in complainant within the State, complainant was not entitled to an injunction to prevent an invasion of its rights, the same not having been threatened.

4. SAME—SYMBOLS.

The use by a secret beneficial society of the letters "L. O. T. M. M.," signifying "Ladies of the Modern· Maccabees," does not interfere with the rights of another society using the letters "L. O. T. M.," signifying "Ladies of the Maccabees."

Appeal from Washtenaw; Kinne, J. Submitted May 12, 1903. (Docket No. 19.) Decided January 5, 1904. Additional opinion on settlement of decree, April 5, 1904.

Bill by the Great Hive of the Ladies of the Maccabees for the State of Michigan against the Supreme Hive of the Ladies of the Maccabees of the World, and others, to restrain interference with a proposed extension of complainant's business. From a decree for complainant, defendants appeal. Reversed.

*De Vere Hall* (*Benton Hanchett*, of counsel), for complainant.

*Russell C. Ostrander* (*Lincoln Avery*, of counsel), for defendants.

CARPENTER, J. This is a controversy between two organizations of the order of the Maccabees. It was once before in this court. See *Great Hive L. O. T. M. for Michigan* v. *Supreme Hive L. O. T. M. of the World*, 129 Mich. 324 (88 N. W. 882). Each of these organizations is incorporated under the laws of Michigan. The two corporations have many resemblances and few differences. Each corporation is a secret, fraternal, and benevolent organization. Each conducts its operations by organizing subordinate lodges or hives, to which the members are admitted by secret initiation. As indicated by their names, only ladies are eligible to membership. Connected with each organization is the feature of life insurance, the benefits of which are confined to eligible members. Each organization uses substantially the same ritual, secret work, regalia, and paraphernalia. The method of insurance of each organization is similar, namely, an assessment is collected from the members insured to pay losses. The material difference between the methods of assessment in the two orders is this: In the defendant order, ten assessments are made each year. One of these assessments is placed in the emergency or reserve fund of the order. The other assessments are placed in a life-benefit fund. From the life-benefit fund losses accruing are paid, and at the end of the year the balance is also placed in the emergency or reserve fund. Complainant order levies as many assessments each year as are required to pay losses. Five per cent. of the total amount of its assessments is placed in the emergency fund. It has never made more than six assessments per year, and its average is four.

Prior to the commencement of this suit, complainant's field of operations was the State of Michigan; defendant's,

all the territory of the United States except the State of Michigan, though it is to be noted that it has not actually done work in all this field. In 1900 complainant determined to extend its operations outside this State, and into the territory then occupied by defendant. It filed this bill to obtain an injunction restraining defendant's interference with this project. This court decided, upon a demurrer to said bill, that under its averments complainant was entitled to relief. See *Great Hive L. O. T. M. for Michigan* v. *Supreme Hive L. O. T. M. of the World*, 129 Mich. 324 (88 N. W. 882). After this determination, defendant order filed a cross-bill, praying an injunction restraining said complainant from invading its territory as proposed. The case was heard in the court below on pleadings and proofs, and a decree granted in favor of complainant. The important question involved is this: Did the two orders voluntarily enter into such a relation that we can and should declare that complainant is in equity estopped from becoming defendant's competitor in the manner proposed?

The determination of this question involves an examination of the facts. In making this examination we are not called upon to pass upon the credibility of witnesses. There is no dispute in the testimony touching these facts. The sole question is, What inference shall be drawn from undisputed testimony?

Of these two organizations, complainant is the older. It began its life as a voluntary organization in 1890. It became incorporated in 1891. By the laws voluntarily adopted for its organization, its jurisdiction was limited to the State of Michigan. Defendant was organized and incorporated in 1892. At this time there were three organizations of Lady Maccabees: viz., one in the State of Ohio, one in the State of New York, and one (complainant) in the State of Michigan. There was, however, no uniformity in their plan of organization, their ritual, or their secret work. One of the purposes of the organization of defendant was to unify these differences. Those responsible for

defendant's organization declared that it did not propose to do any work "in those States where great camps are organized, and have established themselves separate hives of the Ladies of the Maccabees, except with the consent of the executive officers of such great camps." This would exclude the defendant organization from the State of Michigan, as the complainant organization had been organized under the authority of the Great Camp of Michigan. (This was an organization for men, somewhat similar to complainant organization.) By the consent of the executive committee of complainant organization (a committee composed in part of officers of defendant), defendant adopted its ritual and secret work. Complainant did not object to defendant's using its ritual and secret work, but, on the contrary, by action of its executive committee, in 1892, recognizing the necessity of uniformity, passed this resolution: "*Resolved*, that the ritualistic and secret work used by the Great Hive of the Ladies of the Maccabees for Michigan be the same in all respects as that used under Supreme Hive jurisdiction;" and at the next general meeting, composed of delegates from each subordinate hive, held in 1894, by an express amendment to its laws, made itself subject to the "Supreme Hive laws of said order bearing upon ritualistic and social work." In 1894 the two orders entered into the following written agreement:

"In order to make uniform the social and ritualistic work, and to give to the members of the Great Hive for Michigan the privileges of the order in other States under Supreme Hive jurisdiction, all changes in the Supreme Hive ritual and secret work are to be granted to the Great Hive, and all changes in the Great Hive ritual and secret work are to be submitted to the Supreme Hive for approval."

An arrangement was made at the same time by which the Great Hive was entitled to representation in the Supreme Hive upon the payment of a *per capita* tax. In pursuance of this arrangement, until the year 1897 the Great Hive enjoyed a representation in the Supreme Hive

and paid its *per capita* tax. The statement in the opinion of the trial judge that "no action was taken by complainant providing for the fixing or payment of any *per capita* tax to defendant hive" is misleading. It is true that complainant passed no formal resolution fixing the payment of that *per capita* tax, but it is equally true that, for more than two years after the arrangement above referred to, it actually paid to defendant a *per capita* tax of two cents, and enjoyed the benefit of said payment. That complainant received advantages from this arrangement is evidenced by the report of its chief executive officer, made in 1896, who, after referring to the arrangement with the Supreme Hive, stated:

"The work as outlined in the new ritual has proven very satisfactory and is greatly appreciated. It is gratifying to know that wherever we may go, in any State of the Union, or in any L. O. T. M. hive in the world, that our work is uniform, and that we may feel perfectly at home while visiting other hives."

In 1897 complainant became dissatisfied with its basis of representation, refused to continue the payment of its *per capita* tax, and was never thereafter represented in defendant hive. The two orders, however, continued to be on friendly relations until the year 1900. The ritual and secret work, used alike by both orders, had been changed by action of the Supreme Hive alone prior to the year 1895, and were twice subsequently—namely, once in 1895 and once in 1899—revised by joint committees of the two orders. In 1895, by agreement of the two orders, the ritual was copyrighted in their joint names. Until 1900 the same password was promulgated to the hives of each order. Prior to 1899 this password was fixed by defendant's chief executive; afterwards by the joint action of the chief executives of the two orders. The complainant confined its work to the territory of Michigan, and the defendant to the territory outside of Michigan; that is, it had no subordinate hives in Michigan, and it permitted none to become its members who were not members of

complainant organization. Until that time the complainant, by its articles of association and laws, was limited in its jurisdiction to Michigan; and, while defendant had never expressly agreed that it would not be complainant's rival in Michigan, it could not become so without violating a declared purpose of its organization, as well as the understanding under which it was permitted to use complainant's ritual and secret work. The relation of the two parties is clearly stated in a letter dated February 15, 1899, from complainant's great record keeper, or secretary, to the secretary of defendant, from which we quote:

"I find Supreme Hive jurisdiction is given as the United States and Canada. You have not all the United States or Canada. I think you should put in your report you send this month and mention Michigan and New York as not being in Supreme Hive jurisdiction. It is true we use the same ritualistic work and passwords, but further than that we have nothing to do with each other; and I think right is right, *and the Supreme Hive has no more right to claim Michigan than we have to claim any other State.* * * * It is true you have a certain jurisdiction in Michigan and New York, and yet a woman to join the Supreme Hive from either of these States must first be a member of the order in such State."

It is suggested that during their relations complainant did, on one occasion, indicate its understanding that it had a right to use such ritual outside this State. It seems proper that we should examine this incident. In 1897 the Supreme Tent, Knights of the Maccabees of the World, an organization of men (to which, in some particulars, defendant organization is subordinate), requested both complainant and defendant to permit it to use their ritual in the Province of Ontario. In answer to this request, complainant's executive committee declared said ritual "the joint property of the Supreme Hive L. O. T. M. of the World and Great Hive L. O. T. M. for Michigan," and resolved that, "in view of the fact that the second biennial review [convention of delegates of subordinate hives] of the Great Hive for Michigan will be held in the city of Detroit in

June, 1898, it is the sense of this committee that action on this request be deferred until it can be placed before the members of the order at said Great Hive biennial review." We do not think that this action indicated complainant's understanding that it had a legal right to use the ritual outside of the State. It went no further than to indicate its understanding that no other organization than defendant could use the ritual without its consent.

By using a common ritual, secret work, regalia, and paraphernalia, and respecting the other's rights, each of these orders has had a successful career. Complainant has a membership of 63,400. Its emergency or reserve fund is $65,000. Defendant has attained a membership of 99,138. Its emergency fund is $298,837.50. It has extended its work into 42 States and Territories of the Union. To build up and extend its work, defendant has expended over $200,000.

In 1900 complainant, as heretofore stated, determined to extend its field of operations beyond the territory of Michigan, and into that theretofore and then occupied by defendant. Until that time complainant, by its laws voluntarily adopted, was limited in its jurisdiction to the State of Michigan. Its articles of incorporation also limited its jurisdiction to Michigan. Changes were subsequently made, both in its articles of incorporation and laws, extending its jurisdiction to "other States and Provinces." For the purpose of this opinion we will assume that these changes have been legally made, though their legality is challenged by defendant's counsel. After the decision in the court below, but before the decree, complainant, by amendment to its articles of incorporation and voluntary laws, changed its name from "The Great Hive of the Ladies of the Maccabees for the State of Michigan" to the "Ladies of the Modern Maccabees," and changed the symbolic letters from "L. O. T. M." to "L. O. T. M. M.," with a view of obviating some of the objections of defendant. While it is objected by defendant's counsel that these amendments come too late to be of ser-

vice to complainant in this case, it is unnecessary, in our judgment, to pass upon this objection, because, for reasons hereafter stated, they do not, in our judgment, answer other valid objections to complainant's project.

Complainant's sole purpose in enlarging its field of operations was to promote its material prosperity. The project, to quote complainant's chief executive, was "purely a matter of business." This purpose more clearly appears from an address to the order, made by said chief executive, from which we quote:

"It would seem that, if our assessments are to be kept at the low rate they have been in the past, our membership must certainly be kept moving, and the field should be a broader one. * * * We have had five or six assessments per year,—never more than six, and the average has only been slightly over four,—and we want to keep that. It has been our pride and our boast,—our low rate of assessment."

We scarcely need to be told that, if these two orders compete in the same field for insurance, the argument of cheaper insurance will be used to secure membership in complainant organization. When its chief executive officer was a witness, the following occurred on her cross-examination:

" Q. I ask whether it is not a part of your purpose, that being based also upon your history, to say to people that the Supreme Hive has ten assessments in a year for about the same amount per age that you make, where your extreme number of assessments has been six. Is not that an argument which you intend to use in that competition, if you enter into it?

"A. It is not an argument that I intend to use.

"Q. It will be made known, will it not?

" A. I could not say as to that. I shall not be doing the work personally everywhere."

What will be the effect of the competition of these orders, if complainant becomes defendant's rival in the territory in which defendant has been and is now doing business? We have already said that both complainant and defend-

ant are using the same ritual and secret work.   In making this statement we do not overlook the finding in the opinion of the court below that, "since the beginning of this litigation, defendant hive, through certain of its executive officers, has prepared, or is now preparing and has practically completed, a ritualistic and ceremonial work which is distinct from that used by complainant and defendant, as seems to be indicated from the proofs adduced."   It is not meant by this to assert that the ritual above referred to is now in use by the defendant order, for it is distinctly said subsequently:   "The proofs show that the ritual is substantially the same as that used and owned by complainant before the existence of the defendant hive."   The record shows—and this I assume to be what the trial judge had in mind when he said that defendant was preparing a ritualistic and ceremonial work— that defendant has undertaken to make a ritual, "a harmonious and complete new work, possessing literary merit, and embodying the best and highest points of our order." It does not appear that this ritual is completed, and it does appear that the old ritual is still in use.   Defendant's rights are to be determined by the ritual it uses, and which it has a right to use, and not the ritual which it proposes to make.   Nor can we presume that the proposed ritual, "embodying the best and highest points of our order," will differ essentially from that now in use.

If these two orders compete in this field for membership, we shall have the remarkable spectacle of two rival orders using the same ritual and secret work.   The basic principle underlying each of these orders, and the principle which is by each regarded as essential, is the maintenance of secrecy.   The only material difference between the two is in the number of assessments made upon the insured members, complainant collecting in that way only 5 per cent. more each year than is needed to pay its losses, while defendant collects a larger amount in excess of what is needed to pay its losses.   In other words, defendant collects larger annual assessments for the same insurance

135 Mich.—26.

than does complainant, and places this excess into an emergency or reserve fund. In behalf of complainant, it will be contended that it furnishes a cheaper insurance; in behalf of defendant, it will be claimed that it furnishes a safer insurance. Which of these methods is preferable is not a question for this court to determine. It is enough to say that this method of rivalry is very different from any competition which occurs between rival business, fraternal, or church organizations, and that it is almost certain to be ruinous in its effect upon defendant, if not upon complainant, organization. In what respect are defendant's initiatory exercises and unwritten work secret, if a rival order possesses and exercises the right to divulge them to a hostile membership? Each of these orders is based upon the principle that the value of the confidential relations established by the secrecy of its work is of vital importance to its welfare. Neither of them could hope to succeed in competition with rival orders whose secrecy is protected and respected. Their conduct would warrant the charge that they were competing in the sale of the same secrets. Each might expect to become ridiculous in the eyes of the impartial world.

Is complainant under any obligation to refrain from doing this act which threatens to destroy defendant's business? This question cannot be answered in the negative simply because complainant and defendant did not make what amounted to a formal agreement to partition the territory. The obligation to refrain from doing an act so hostile to defendant's interests may be imposed by other circumstances than an express agreement. The facts I have stated prove that complainant not only permitted, but encouraged, defendant to make use of its original ritual, secret work, badges, and paraphernalia. Defendant has expended over $200,000 in establishing its business on the foundation of the ritual and secret work under consideration. Did it make this expenditure believing that complainant, by asserting its rights as the owner of said ritual and secret work, could, whenever it chose, destroy or seri-

ously damage said business? It is impossible to believe that the expenditure was not made under the supposition that complainant would assert no right in said ritual and secret work which would destroy or seriously damage said business. Neither is it possible to believe that complainant was not aware of the supposition under which defendant made this expenditure. Complainant, having encouraged defendant to make this expenditure on the supposition that it had no rights which would jeopardize the investment, is now, according to elementary principles of equity (see *Walker* v. *Bottomley*, 110 Mich. 127 [67 N. W. 1083]), estopped from asserting those rights. It is estopped from asserting a title to the foundation of the structure which it has encouraged defendant to build. It is possible that a different question might be presented if defendant had ever violated its express or implied obligations to complainant, but it violated none of these obligations.

Allusion has been made to the circumstance that, after this case was heard in the court below, complainant changed its corporate name from " The Great Hive of the Ladies of the Maccabees for the State of Michigan" to that of " Ladies of the Modern Maccabees," and instead of using the symbolic letters used also by defendant, " L. O. T. M." (Ladies of the Maccabees), uses the letters " L. O. T. M. M." (Ladies of the Modern Maccabees). These changes might answer some of the objections urged by defendant against complainant's project. Complainant, however, still persists in its determination to use the same ritual, secret work, badges, and paraphernalia used by defendant. Defendant has the same right to insist that the principles of equitable estoppel prevent complainant's use of these in defendant's territory that it once had to insist that complainant should not use there the name and symbolic letters which it formerly used and has now abandoned.

This decision does not, in our judgment, result in giving defendant a monopoly which would be condemned by the courts. No one would think of characterizing the right

which every secret organization has to the exclusive use of its ritual and secret work as an illegal monopoly, nor would any one deny that defendant has this right against all the world except complainant. If this exclusive right was not an illegal monopoly,—and it surely was not,—we do not make it one by deciding, as we do, that, by virtue of the principle of estoppel, it is also exclusive as against complainant.

In our opinion, the decree of the court below should be reversed, and a decree entered here enjoining complainant from competing with defendant in the field now occupied by it, by using the same, or substantially the same, ritual, secret work, badges, and paraphernalia as those used by defendant. Defendant is entitled to costs of both courts.

MOORE, C. J., and MONTGOMERY, J., concurred with CARPENTER, J.

GRANT, J. (*dissenting*). After the decision of this court affirming the decree of the court below in overruling the demurrer to the bill (129 Mich. 324, 88 N. W. 882), the defendant Supreme Hive filed an answer and a cross-bill, asking affirmative relief in the nature of an injunction to restrain the complainant from carrying on its business in those States, Territories, and countries where the defendant Supreme Hive had organized subordinate hives. To this cross-bill complainant filed an answer. Issue was duly joined, proofs taken in open court, and decree entered for the complainant. It is unimportant to set forth the contents of the answer, cross-bill, and answer thereto. But one question is really involved in the case, viz.: Has the complainant the right to enter other States, Territories, and countries to carry on its business with the use of its present name, and its ritual, paraphernalia, etc., which the defendant Supreme Hive has entered and in which it is carrying on its work? It is conceded that there was no express agreement that complainant should confine its work to the State of Michigan, or be limited in the use of its name and ritual to this State. We think it

equally clear that no such agreement can be implied from the permission granted by the complainant to defendant to the use of its ritual, etc.   Defendant's counsel concede the right of complainant to extend its jurisdiction into other territory, but deny its right to use the same means to acquire membership that have been and are now in use by the defendant.

The learned circuit judge filed a clear and able opinion, which so completely covers the case that we adopt it.   It is as follows:

"On the 12th day of April, 1848, the legislature of the State of New York passed an act entitled 'An act for the incorporation of benevolent, charitable, scientific, and missionary societies' (Laws 1848, chap. 319), and under this act the first order of the Knights of the Maccabees was organized, in 1878, the object of which was to improve the moral, mental, social, and physical condition of the members; to aid, assist, and support them or their families in case of want, sickness, or death; and to create, hold, manage, and disburse a fund for the relief of such members and their families, in case of want, sickness, or death, by assessments upon such members.

"The associations which passed under this name all became defunct except the one now existing in this State, and known as the Great Camp of the Knights of the Maccabees for the State of Michigan, which was organized in the year 1881.   In 1882 the Supreme Tent, Knights of the Maccabees of the World, was organized, and on the 24th day of March, 1886, some of the ladies of Muskegon associated themselves together into a ladies' order, and took the name of Ladies' Knights of the Maccabees, among their first acts being the appointment of a permanent committee for attendance upon the sick and distressed; and on the 13th day of August, 1890, this body became known as the Great Hive of the Ladies of the Maccabees for Michigan, having a full system of laws, ritualistic and secret work; and the objects of the association were to unite ladies of sound bodily health and good moral character, who were socially acceptable, between the ages of 16 and 56 years, provided they were the wife, widow, sister, or daughter of a member of the Knights of the Maccabees, or the mother, sister, or daughter of a member of the Ladies of the Maccabees; to give all aid in

its power to its members and those depending upon them, and to the Knights of the Maccabees and their families, wherever found needing or deserving it; to educate their families socially, morally, and intellectually; to create a fund for the relief of the sick and distressed members, and generally to care for the living and to bury the dead; and to establish a benefit fund, from which, on satisfactory evidence of the death of an endowment member of the order, a sum not exceeding $1,000 should be paid to the beneficiary thereof, and upon such member becoming totally disabled, or reaching 70 years of age, to pay her such sum of money in such manner as might be fixed by the laws of the order. The meeting of August, 1890, was the first annual review of the Great Hive, and at that time a motion was adopted leaving with the executive committee of the order the matter of organizing subordinate hives outside of this State, power being given to such committee to act.

"By Act No. 120, Pub. Acts 1891, it is provided that this body of ladies might incorporate; and, on the 10th day of December following, articles of incorporation were duly filed by it with the Secretary of State, it adopting the name 'Great Hive, Ladies of the Maccabees for Michigan;' the objects and purposes of the order being, as defined in its articles, practically the same as above set forth. In the early part of 1891 some ladies in New York associated themselves together under the name of Lady Maccabees, and, without any action or authority of the Michigan organization or its executive committee, appropriated its ritualistic and secret work.

"Prior to the 1st day of October, 1892, the Supreme Tent, Knights of the Maccabees, were importuned by certain officers connected with the Michigan organization to establish a Supreme Hive, and on the 1st day of October of that year that body adopted a resolution providing for the existence of the Supreme Hive, Ladies of the Maccabees of the World, and named as principal officers therein ladies who were then occupying the principal positions in the complainant; and, on the 19th day of October following, the executive committee of complainant met at the city of Detroit, the members thereof being Miss Becker, Miss West, and Mrs. Harrington, and they associated with them Mrs. Danforth, Mrs. Johnson, and Mrs. Cathcart, thereby making the committee consist of six, instead of three, as provided by the laws, of which six, five were offi-

cers in the new organization, and this tribunal so consti-
tuted adopted a resolution that it was desirable that the
different orders throughout the country should have uni-
form ritualistic and secret work, and that the work used by
complainant should be the same in all respects as that used
by the Supreme Hive.

"Prior to the time of any action taken looking to the
organization of defendant hive, the complainant, in addi-
tion to such complete ritualistic and secret work, was in
possession of and used badges and other paraphernalia,
including representations or cuts of the Cross and Crown,
the Bee Hive, the Five Links, the Scroll, the Laurel
Wreath, the Stars, and the World, and employed the
terms ' Ladies of the Maccabees,' ' Great Hive,' 'Subordi-
nate Hives,' the symbolic letters ' L. O. T. M.,' and the
Latin motto, '*Ad astra per aspera*,' and the members
when in session wore gowns of various designs. Its meet-
ings were held in secret, and a password was required
before admission thereto. This ritualistic and secret work,
including such badges, representations, cuts, words, and
terms, were all appropriated by the defendant hive and its
officers upon its organization.

" On the 25th day of May, 1893, the legislature of this
State passed what is known as the uniform bill for the incor-
poration of fraternal benefit societies, and the same appears
as Act No. 119 of the laws for such year. By section 1 of
said act a fraternal benefit association is declared to be a
corporation formed, organized, and carried on for the sole
benefit of its members and their beneficiaries, and not for
profit. Such association, having a lodge system, with a
ritualistic form of work and a representative form of gov-
ernment, and making provision for death benefits, may, in
addition thereto, provide for the payment of benefits in
case of sickness, accident, disability, or old age of its mem-
bers; the funds from which the payment of such benefits
is made and for the expenses of such organization being
derived from assessments or dues collected from its mem-
bers. Payment of death benefits is authorized to be made
to any one within the fourth degree of relationship to the
member, and such association is exempt from the provisions
of the insurance laws of the State. By section 9 such
association is authorized, by a vote of the governing body,
to hold its annual or biennial meetings in any State or
Territory of the United States, or any Province of Can-
ada, where it may have subordinate lodges, and by section

the money or other benefit, charity, relief, or aid to be paid, provided, or rendered is declared to be not liable to attachment by trustee, garnishee, or other process, and cannot be seized or applied by any legal or equitable process, or by operation of law, to pay any debt or liability of a certificate holder, or of any beneficiary named in the certificate, or of any person who may have any right thereunder.

"At the fifth annual review of complainant, held at Lansing in September, 1894, Miss West, who had been by vote of that body made what is known as past great commander, and who was at the same time supreme record keeper of defendant hive, without previous formal notice, presented to said review a resolution looking toward an interchange of social relations between the two bodies, and this became incorporated as one of its laws. By the terms thereof complainant was to pay to defendant hive such *per capita* tax and be entitled to such representation therein as should be fixed by it and accepted by defendant hive, such *per capita* tax being to give complainant representation in defendant hive and a voice in its laws and management. At the next meeting of the defendant hive, held in May, 1895, its laws were amended so as to provide that complainant should be entitled to a limited representation in defendant hive, such representatives to consist of its great commander and great record keeper, but these representatives were precluded from voting upon any questions that related to the life-benefit law.

"On the 5th day of October, 1895, complainant filed with the commissioner of insurance articles of incorporation under Act No. 119, Pub. Acts 1893, referred to above..

" No action was taken by complainant providing for the fixing or payment of any *per capita* tax to defendant hive, but the same was the subject of negotiations between complainant's executive committee and the board of trustees of defendant hive, and this led to a refusal on the part of complainant to pay such tax, and at the biennial meeting held by defendant hive in July, 1897, complainant's representatives were denied admission thereto, and this resulted in a conference committee, which agreed upon an annual tax of $150 to be paid by complainant for such representation; but this report was rejected by said meeting, and in lieu thereof a law was enacted that complainant hive should have representation only so long as it conformed to the social, secret, and ritualistic laws of defendant hive, but

that such representatives should not be entitled to vote on any question arising under the life-benefit law of defendant, and should not be entitled to mileage or *per diem.* This qualification was not accepted by complainant's representatives, and never thereafter was any representation asked for or had by complainant in the biennial meeting of the defendant hive.

"In the month of June, 1898, complainant's review was held, and the provision relating to the interchange of ritualistic and secret work between the two orders was stricken from its laws, and a provision was enacted to the effect that no officer of complainant should thereafter hold any office in defendant hive.

"In the month of July, 1899, at defendant's biennial meeting, Mrs. Burns, complainant's commander, who was also a member of defendant hive, was present as a visitor, and the provision enacted above, relating to representation of complainant in defendant hive, was stricken therefrom, and, at her suggestion, in lieu thereof, it was provided that the supreme commander should appoint a committee of five to act with a like committee to be appointed by the great commander of complainant to formulate such changes in the ritualistic and secret work as might be deemed necessary, and, when such changes were agreed upon, they were to become a part of the ritualistic work, the password to be arranged by the two, and to be promulgated through the office of the two record keepers; and under this a meeting was had, and the ritualistic work was revised, but no important changes were made therein, and the ritual as left by this committee was in all of its material parts the same as that owned by complainant prior to the existence of defendant hive.

"In June, 1900, complainant held its biennial review, and its laws were so amended as to recognize the provision in defendant's law relating to a joint ritualistic committee, and prior to its adjournment it adopted a resolution instructing its executive committee to extend its work outside the State whenever, in the judgment of such committee, it should be deemed expedient.

"In the month of October, 1900, complainant's executive committee met and adopted a resolution extending the work of the order outside the State, and also took action providing for amending its articles of incorporation; and in the month of November it applied to the commissioner of insurance to file such amendments, and he there-

upon cited both complainant and defendant hive to appear, on the claim made by the latter and its officers opposing the right of complainant to make such amendments, and, after a full hearing, an order was made by such commissioner granting such leave of amendment. It is claimed by complainant that at this meeting the defendant hive, through its representatives, threatened to bring actions and suits against it in every State to which it should extend its work, predicated on an exclusive right on the part of defendants to use said ritualistic and secret work in said States; and based on this and an interview of Miss West, appearing in one of the daily papers at Port Huron, it filed its bill of complaint in this court on the 5th day of December, 1900, to contest such claim of defendants to an exclusive right to said ritual, and for other relief, making the Supreme Tent and its officers parties defendant. The latter all filed a disclaimer, and defendants herein filed a demurrer; and thereupon complainant amended its bill, and proceeded alone against the defendant hive and its officers; whereupon the defendants again demurred to such amended bill, and said demurrer was overruled, and an appeal was perfected in this court on the 4th day of June last.

"In the month of July, 1901, defendant hive met again in biennial session, and eliminated from its laws all reference to complainant, and such joint committee of conference and uniformity of ritualistic and secret work and password. At this meeting defendant's supreme commander made a report which may be fairly said to indicate that its officers had prepared new complete ritualistic and secret work, altogether different from that used in common between the parties, and a portion of such work was put in use or exemplified at said meeting. The record of that session sets forth the action taken in that regard, and, although such officers were present at the hearing, they were not tendered as witnesses.

"On the 28th day of January last, the Supreme Court handed down an opinion sustaining this court in overruling such demurrer. *Great Hive L. O. T. M. for Michigan* v. *Supreme Hive L. O. T. M. of the World*, 129 Mich. 324 (88 N. W. 882). By this decision it was determined that the bill filed is a bill of peace, having for its purpose to adjudicate the claim of defendants to an exclusive right to use such ritualistic and secret work outside this State; that there was authority in law for complainant to

amend its articles of incorporation; and that the courts of this State may enjoin defendants from prosecuting suits in other States and countries, based on such claim of exclusive right.

"Subsequently, and on or about the 15th day of February, defendants filed their answer to such bill, admitting therein that, under complainant's laws, it was vested with supreme legislative, executive, and administrative authority, and as such endowed with exclusive power to make all laws, rules, and regulations for its government, and the government of its members, that it may deem expedient, which do not conflict with its organic law or the law of the land, and asking, among other things, in the way of affirmative relief, that complainant be perpetually restrained and enjoined from using the name 'Ladies of the Maccabees,' the ritual, secret work, odes, installation and burial services, drills, badges, emblems, pins, robes, and other paraphernalia now in use by it and by defendant hive, in organizing or attempting to organize bodies outside of this State.

"On the 15th day of February complainant filed an answer to such cross-bill, and an issue was framed regarding the several claims hereinafter set forth, and thereafter complainant gave notice of taking testimony in open court, and at the hearing proofs were taken involving the questions presented by such issues, and after a full consideration the following facts appear:

## "Findings of Fact.

"'I think the evidence submitted fairly establishes the following facts:

"1. That complainant came into existence on the 24th day of March, 1886, under the name Lady K. O. T. M. for Michigan, and assumed its present name, in all parts, as early as the year 1890, and that defendant hive came into existence on the 1st day of October, 1892, and since such time both of said bodies have held and enjoyed their respective names.

"2. That said bodies have never had any business relations one with the other, and each has always been distinct from the other in all ways, other than at one time they bore certain relations to each other in a limited social way, which relations wholly ceased in the year 1900.

"3. That, as between said bodies, as early as the year 1890, complainant enjoyed the exclusive right to use the

terms 'Ladies of the Maccabees,' 'Great Hive,' 'Subordinate Hives,' and the symbolical letters 'L. O. T. M.,' the Latin motto '*Ad astra per aspera*,' the Cross and Crown, the Bee Hive, the World, the Five Links, the Scroll, the Laurel Wreath, and all designing terms, words, symbols, characters, and representations now used by it; and the only right defendants ever acquired to use the same was permission and leave granted by complainant, which was never intended to be and never was exclusive, or a right that precludes it from using the same in this or any other State.

"4. That, as early as the year 1890, complainant owned and possessed the ritualistic and secret work now used in common by it and the defendant hive, and the said work is the same as so originally owned by complainant, with the exception of some minor changes therein which do not affect the plan or design thereof, and the only right of defendants to use the same is a leave and permission granted by complainant, which was not intended to be and was not in fact an exclusive one, and in no way precludes complainant from using the same in any other State to which it may extend its work.

"5. That defendants have made and now make the claim that, as against complainant, the leave and permission granted by it to use such terms, words, symbols, characters, representations, and the said ritualistic and secret work, was an exclusive one, that precludes complainant from using the same outside of this State, which claims are not supported by the proofs.

"6. That no agreement or contract of any kind exists or has existed between complainant and defendant hive, or their officers, that precludes either complainant or defendant from carrying on its work, in this or any other State, freed from all claim of right on the part of the other to interfere in so doing.

"7. That the laws and plan of work of complainant and defendant hive differ in many of their essential features, as is evidenced by the following facts: In the case of complainant, its principal office is at Ann Arbor; the representation in its biennial reviews consists of one delegate from each of its subordinate hives; the assessments for benefits are made on its endowment members only as required to meet claims as they arise thereon, being unlimited in number each year; a *per capita* tax of 50 cents on each member is levied to meet expenses; an appropria-

tion of 5 per cent. of its annual endowment assessment is set aside as an emergency fund; and it is an independent supreme body, from which there is no appeal; while, in the case of the defendant, its principal office is at Port Huron; the representation in its biennial meetings is in proportion to the membership in the several States; 10 assessments for benefits are made on its endowment members each year, whether required to pay endowment claims or not; 12 per cent. of the whole amount collected as endowment assessments is set aside to meet expenses, in lieu of a *per capita* tax; the whole of one of its ten annual assessments so collected is set aside as an emergency fund; and it is subordinate to the Supreme Tent, its endowment certificates being guaranteed by such order, and an appeal being permitted thereto.

"8. That, while the membership of defendant hive is largely outside this State, it has always claimed and exercised the right to admit to membership within this State any qualified woman residing therein, who was a member of complainant organization, that it might elect, without let or hindrance from complainant.

"9. That complainant has about 3,000 members outside this State, and in other States, nearly 300 being in Chicago, and these are asking an extension of its work, and it will be benefited by the extension thereof, by reason of the lower death rate prevailing in many of said States, and that it is desirable for it to make such extension in order to enable it to continue to furnish benefits to its members at its present rates.

"10. That the purpose of complainant in extending its work is to enable it to furnish benefits to its members at its present rates, and this purpose does not spring from any desire or intention on the part of complainant in any way to prejudice, injure, or interfere with the defendants in the prosecution of their work, or the success and prosperity of their order.

"11. That the complainant does not now and never has made any objection to the defendant operating and prosecuting its work within the State of Michigan, and that in law, equity, and justice there is no valid reason why the complainant; so far as the defendants are concerned, should be confined to the State of Michigan, and not be allowed to extend its order to any State or Territory of the Union, or any foreign country, and that the best interests, if not the future existence, of the complainant, demand such extension.

"12. That defendants have threatened to bring and maintain actions and suits as alleged in complainant's bill, and protests against extending its work have been filed with the officers of other States.

"13. That each of said bodies is organized under Act No. 119, Pub. Acts 1893, and that neither is engaged in its work for profit; that no confusion from similarity of names or paraphernalia will arise, and no harm can come to either from carrying on its work in the same territory, so long as their ritualistic work is secret, and their banners and badges bear their respective names as distinguishing features.

"14. That, since the beginning of this litigation, defendant hive, through certain of its executive officers, has prepared, or is now preparing and has practically completed, a ritualistic and ceremonial work which is distinct from that used by complainant and defendant, as seems to be indicated from the proofs adduced.

## "Conclusions.

"The defendants urge their rights to restrict the complainant to the State of Michigan for the following reasons:

"(a) Similarity of names of the two orders, and a paramount right in defendant hive to use the name.

"(b) Similarity of ritualistic and secret work, and an exclusive right on the part of defendants to use such work outside this State.

"(c) Similarity in design of paraphernalia used, and an exclusive right on the part of defendants to use the same.

## "Similarity of Names.

"The name of the two orders and the organization thereof is, in fact, distinct; but, if this were not so, it would seem that complainant has at least an equal, if not a superior, right to use the name unhampered by the defendants, as it took and used it, and each part thereof, before the existence of defendant hive. It is well settled that the corporation or company first using a name has a prior right thereto.

"But, in my opinion, there is sufficient dissimilarity in the names to readily and fully distinguish the two orders. I do not think there can be any danger of confusion, or that any one is likely to be misled into joining the one order when she intended to enter the other. In these lat-

ter days, the average person who wishes to enter any of these social or benefit organizations comes very readily and quickly into possession of the common knowledge which circulates freely wherever these orders exist, and, in my opinion, there need be no apprehension on that ground. The complainant bears the name 'Great Hive, Ladies of the Maccabees for the State of Michigan,' and the defendant bears the name 'Supreme Hive, Ladies of the Maccabees of the World;' and, wherever complainant does work, it will be recognized at once as the Michigan order, and the two bodies being, in fact, different organizations, in my opinion no confusion can arise therefrom. Geographic terms, as applied to the names of corporations, are sometimes used to furnish the most distinguishing features.    The First National Bank of Ann Arbor, the American Loan & Trust Company, and the Michigan Trust Company are at once recognized as different organizations from the First National Bank of Jackson, the American Trust & Loan Company of New York, and the Detroit Trust Company, although they may all be engaged in a similar business.    In the case of *Supreme Lodge Knights of Pythias* v. *Improved Order Knights of Pythias*, 113 Mich. 133 (71 N. W. 470, 38 L. R. A. 658), the Supreme Court decided that these were distinguishing names.    The evidence on the hearing of this case is replete with the names of societies which closely resemble, and yet which readily distinguish, each other.

## "Similarity in Ritualistic Work.

"The proofs show that the ritual is substantially the same as that used and owned by complainant before the existence of the defendant hive; that while, through their joint action, there have been some minor changes and improvements, yet that the plan, scope, and design have remained unchanged.    It would seem that, if the superior right to this ritual exists, it would rest with the complainant, and that, while complainant accords full right to defendant hive to use this ritual whenever and wherever it wishes, it certainly would be inequitable and unjust on the part of defendant to deny the same privilege, right, and authority to the complainant.    I do not understand upon what theory or principle the defendant can restrict the complainant to the use of the ritual within the State of Michigan, and arrogate to itself the exclusive right to its use throughout the rest of the world.

" The same may be said of the

." Paraphernalia.

" All of the paraphernalia, including the badges, representations of the Cross and Crown, the Bee Hive, the Five Links, the Scroll, the Laurel Wreath, the Stars, and the World, the terms 'Ladies of the Maccabees,' 'Great Hive,' 'Subordinate Hives,' the symbolic letters 'L. O. T. M.,' and the Latin motto '*Ad astra per aspera*,' were in use by complainant before the existence of defendant hive, the same as are now used by the two orders, and I am not aware of any evidence which shows that complainant has parted with its right or privilege of using the same.

" Apparently no exclusive right can be said to rest in either of these orders to use the Cross and Crown or other representations which are commonly employed by societies, and the record shows that many other orders use certain thereof. The Cross and Crown are both used by the Royal Arcanum, the Knights Templar, and the Ladies of the Golden Eagle; the Bee Hive, by the Rebeccas; the Links, by the Odd Fellows and the Rebeccas; the Laurel Wreath, by the Rebeccas, the Eastern Star, the Pythians, the Rathbone Sisters, the Daughters of Liberty, and the Woman's Catholic Benevolent Legion; the Star, by the Eastern Star, the Rebeccas, and the Odd Fellows; the World, by the Knights of the World, the American Federation of Labor, the Improved Order of Good Templars, and the Woodmen of the World. It can hardly be said, in view of the universal use of these representations, that as against complainant, who first used them, defendant hive can be said to have either a paramount or an exclusive right thereto.

" Both of these societies, as well as all other fraternal benefit associations, under the laws of their organization, are declared to be corporations engaged in their labor without profit, and their primary purpose consists in ministering to the sick and infirm, feeding the hungry, aiding the poor and needy, comforting the distressed, burying the dead, and teaching morality to their members. All of these are ministrations which pertain to right living, and no one of them can, from their nature, be appropriated exclusively by any one organization, or speculated in at a profit. I am not aware that any court has ever confined or restricted the spreading of these benefits, or created

any monopoly therein. The law favors and encourages the work of these associations from the fact that they aid in relieving distress and teach good citizenship. Under the law of their organization, they are declared to be exempt from the provisions of the insurance law of the State, and the fund provided by them is exempt from legal process. The officers of complainant have been instructed to extend its benefits to other States of the Union, and I am unable to see any valid or substantial reason why the defendants should oppose the proposed action.

"In my opinion, there is no real obstacle to the proposition that these two orders should go forward in their humane mission in a spirit of harmony and fraternity, and that they can, as they should, be of mutual aid and assistance, without injurious competition or rivalry. It may with good reason be said that the defendant is an offspring of the complainant. No collision between these orders is inevitable. No real trouble exists, unless it is sought for. If, however, forgetful of the nobility of their purpose, a spirit of independence or arrogance is fostered, and bitterness and warfare are engendered, neither will be benefited thereby, and distress and disaster may await both.

"While my conclusion in this matter may be erroneous, yet I have entertained only one doubt respecting this controversy, and that is the question whether the courts of this State ought to and can control the action and conduct of these parties when they pass into other States and Territories. The Supreme Court, on the decision of the demurrer, seems to have decided that the courts of this State may exercise such power. I regard it as very fortunate that such power exists. It certainly is for the best interests of both of these orders that there should be a speedy and final determination of this controversy. It certainly would present a most unhappy and unseemly spectacle to witness these fraternal orders warring against each other in foreign jurisdictions.

"I think that the complainant is entitled to a decree establishing its earlier right to the name, to the secret and ritualistic work, and paraphernalia, including badges, representations, terms, symbolic letters, motto, and gowns, with an equal co-ordinate right on the part of each of said orders to use the same, with the distinguishing marks as hereinbefore stated, whenever and wherever either may choose, and denying to the defendant the possession of any

135 MICH.—27.

paramount and exclusive right in the same; also requiring the defendants to withdraw such protests as may have been filed without the State, and perpetually restraining and enjoining them from in any manner interfering with complainant in the extension and expansion of its work. I think there should also be reserved equity, to the end that, if the defendants disregard the terms of this decree without this State, then the complainant should be entitled to apply by petition or supplemental bill to this court for further relief against said defendants, requiring them either to surrender such ritualistic work and paraphernalia, or to make such changes in the same as will serve to remove the objections so made by them, in such manner as may then be determined."

We think there is no room for the application of the doctrine of estoppel. These two organizations were organized under the laws of this State for the same worthy and humane purposes. A common ritual was believed to be advantageous. The defendant borrowed the ritual from the complainant. It was undoubtedly designed and agreed that both should use it. Each was interested in any changes. The fact that changes were made by the mutual action of both is not indicative that each intended to be confined in its use to that jurisdiction which it may first have entered. There are many fraternal organizations of this character in this State and country. If six of them deemed it advisable to use a common ritual, paraphernalia, etc., each one of whom was then doing business exclusively in one State, and should by mutual action adopt a common ritual and means by which the members of one could be admitted socially into the meetings of the others, would this raise a presumption that each intended thereafter to confine its operations to the State then occupied by it or any other into which one of them might first enter? We find nothing to indicate that either intended by its acts to limit its jurisdiction in the use of the ritual, etc. On the contrary, as early as August, 1890, long before the defendant was organized, at its annual meeting complainant instructed its executive com-

mittee to investigate the matter of organizing hives outside the State of Michigan, and gave it power to act.

It is urged that the defendant has spent $200,000 in extending its work into the States and Territories of this country,— for it now has entered them all,— and that it would be gross injustice to permit complainant now to enter this territory in competition with the defendant. Whether the defendant has spent much or little is no concern of the complainant, and does not affect its rights. If defendant spent that large sum, it is fair to presume that it has received this expenditure back in advantages derived from it and from the use of the ritual and other things which the complainant so kindly permitted it to use.

There is, in my judgment, no foundation in experience in holding that the complainant will ruin the defendant's business in other States and Territories now occupied by it. There are probably hundreds of these fraternal organizations in existence, each competing with the other, and most, if not all, apparently doing a thriving business. It does not follow that the complainant can crush the defendant any more than that the defendant can crush the complainant in Michigan or elsewhere. As already shown, many of these organizations use many of the same emblems, insignia, etc., that are used by the parties to this case, and they have a perfect legal right to do so. There is no more reason for holding that these two organizations will crush each other, or that one would ruin the other, than there is that manufacturing corporations, engaged in manufacturing the same articles with the same machinery, cannot carry on a thriving business in competition with each other, or in holding that the many church organizations cannot exist side by side, or that the many life-insurance companies, each claiming to do business better and cheaper than the others, cannot do business within the same territory.

We must, therefore, look back to the circumstances under which the defendant was organized, and unless we can there find some implied understanding that complainant

was forever to have the territory of Michigan to carry on its business, with the ritual, etc., and that defendant was to have the rest of the world, provided it got into the rest of the world first, with the ritual, etc., there is no room, in my judgment, to apply the doctrine of estoppel. Such a monopoly in the business world would be condemned by the courts. Estoppels were formerly looked upon as odious, and, though the doctrine in proper circumstances is now regarded a salutary one, yet it is applied with great strictness, and "estoppels must be certain to every intent, and are not to be taken by argument or inference." 11 Am. & Eng. Enc. Law (2d Ed.), 388. There should be no doubt as to the acts, and the inference to be drawn from them, in order to close complainant's mouth against its interests, and prevent it from using its own ritual, etc., wherever it may choose to go. I am unable to find anything in the record to thus estop it.

The other questions raised by the defendant deserve consideration:

1. Defendant's counsel say in their brief: "Real parties in interest as defendants are not named in the record at all. The Supreme Hive, defendant, has not a single subordinate hive within the jurisdiction of the court." If by this is meant that these subordinate hives are necessary parties, or that the decree in this case against the Supreme Hive is not binding upon its subordinates, the position is untenable. Both complainant and defendant are Michigan corporations; they have their main offices and officers in this State; they are amenable to the process of its courts. The construction placed by the courts of this State upon the laws under which they are organized, and upon their articles of association and by-laws, will be respected and followed by the courts of other States, and by the United States, unless some federal question be involved. The defendant has not the power to place its subordinate bodies beyond its own control, and any decree of the courts of this State affecting its rights is binding upon its subordinate lodges or hives. *Lamphere* v.

*Grand Lodge A. O. U. W.*, 47 Mich. 429 (11 N. W. 268).

2. It is contended that the decree is in excess of the relief prayed for by the bill, and that it in terms enjoins the defendant from instituting any suit or taking any steps whatever in any other State against complainant. This contention is based upon that part of the decree which restrains the defendant from in any way "interfering with, preventing, or obstructing complainant, its said committee, officers, members, representatives, attorneys, or agents, or its said subordinate hives, their committees, officers, members, representatives, attorneys, or any thereof, from carrying on its said work or business in this State, or from extending the same to other States, Provinces, Dominions, and Territories, or from organizing its subordinate hives, and soliciting accession to its membership therein."

The relief granted can, of course, be no broader than the relief asked by the bill. This part of the decree is a portion of a lengthy clause defining the acts from which the defendant is restrained. When read in connection with the rest of the decree and the opinion of the circuit judge, it means only this: That the suits and acts from which it is restrained are those complained of in the bill. They refer solely to the rights of the complainant to use its name, its ritual, paraphernalia, etc., in other territory.

The right to maintain such suit was determined in the former decision. In addition to the authorities there cited, see, also, *Dehon* v. *Foster*, 4 Allen, 545; *Vermont & Canada R. Co.* v. *Vermont Cent. R. Co.*, 46 Vt. 792; *Sandage* v. *Manufacturing Co.*, 142 Ind. 148 (41 N. E. 380, 34 L. R. A. 363, 51 Am. St. Rep. 165).

The decree should be affirmed, with costs.

HOOKER, J., concurred with GRANT, J.

### ON SETTLEMENT OF DECREE.

CARPENTER, J. According to the opinion of the majority of this court, defendant is entitled to a decree enjoining

complainant from competing with it in the field now occupied by it, by using the same, or substantially the same, ritual, secret work, badges, and paraphernalia. Complainant asks this court, either before or at the time of settling the decree, to investigate and determine whether its proposed new ritual, secret work, badges, and paraphernalia sufficiently differ from those used by defendant to enable it to carry on its proposed competitive work.

There are many objections to the adoption of this course. It would offer a temptation almost irresistible to both parties to make extreme claims. Complainant naturally desires to make as little change as possible in its present method of work, and just as naturally defendant wishes those changes to be marked. This court would therefore be compelled to answer questions relating to controversies which have not arisen in fact, and which may never arise in fact. It is the office of courts to determine controversies, rather than to answer questions.

Moreover, the adoption of such a course would compel the court to answer abstract, rather than concrete, questions. Complainant will affirm and defendant will deny that its proposed new ritual substantially differs from its old. If we undertake to determine this question before a controversy has actually arisen, we have simply the evidence that is afforded by an inspection of the two. If this question arises in an actual controversy, we not only have that evidence, but we have the evidence which is furnished by the operation of the two systems. In *Supreme Lodge K. of P. v. Improved Order K. of P.*, 113 Mich., at page 140 (71 N. W. 473, 38 L. R. A. 658), it is said: "The best possible evidence that names are sufficiently similar to mislead the public is the fact that the public, or some portion thereof, has been misled." A court should be reluctant to adopt a course which deprives it of the best evidence attainable. It should aim, rather, to have the advantage of all points of view, than voluntarily to shut itself off from the best. The court which should undertake to answer these questions in this manner would act in

a legislative or administrative capacity, rather than in a judicial capacity. It is by no means clear that it would be to complainant's advantage to have this court determine these questions without all the evidence attainable. If complainant proceeds with the honest determination to make its new ritual, work, etc., substantially different from the old, we can see no reason to fear that it will fail to do so. Its officers and counsel are better informed, and therefore better prepared to accomplish that object, than any member of this court. We are forced, therefore, to decline to take the course requested by complainant.

Complainant contends that, as the basis of this decree is its own exclusive rights in Michigan, an injunction should issue protecting those rights. To this we cannot agree. It is true that complainant has those exclusive rights. But, as shown in the majority opinion in this case, those rights have never been denied. There is nothing to indicate that complainant needs an injunction to protect them. Its right to them is not claimed by the pleadings in the case. It is clear that complainant would be entitled to relief, either in the form of an injunction or other adequate relief, if those rights were interfered with. The only ground upon which we could now grant the injunction—and it is unnecessary to say that an injunction cannot be granted on such a ground—is that complainant has this exclusive right; a right which is conceded and has never been denied. It is not sufficient for complainant to say it does not harm defendant to grant this relief. Courts of equity do not give the extraordinary process of injunction simply because no harm results to the defendant. The issuance of an injunction necessarily implies that defendant has committed or threatened to commit a wrong, and, when it has done neither, the writ should not issue. Complainant's exclusive right—at least, as the parties are now situated—forms the basis of defendant's right to relief. And this circumstance is, in our judgment, sufficient to insure its protection.

The second decree prepared by the defendant goes

farther than the prayer of its cross-bill. To such a decree it is not entitled. As we indicated in the opinion in this case, we do not regard the symbolic letters "L. O. T. M. M.," used in connection with the term "Ladies of the Modern Maccabees," as an interference with any of defendant's rights.

The decree will therefore be at once entered in accordance with these views.

The other Justices concurred.